IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SEAN D. WILLIAMS,<br><br>                             Plaintiff,<br>         v.<br><br>PHILLIP BERNOT,<br>in his individual capacity<br><br>                             Defendant. | CIVIL ACTION NO.<br>18-2773 |

Perkin, MJ                                                                                                        June 8, 2020

**MEMORANDUM**

Plaintiff Sean Williams brought this action seeking relief for an alleged violation of his civil rights asserting liability against the defendants pursuant to 28 U.S.C. §1983.[1] Plaintiff asserts that Defendant Officer Philip Bernot of the City of Lancaster Police Department deployed his Taser against him while outside of a house on Prince Street in the City of Lancaster. The facts developed pretrial indicate that at 10:16 a.m. police received a dispatch for a disturbance at 19 S. Prince Street, on the block where Plaintiff was located, involving three males and a female. The dispatch indicated that a "male with a bat" went after another subject at the corner of Prince and Mifflin. It further specified that the male was black, with unknown clothing, and wielded the bat at "2 males and a female." Officer Shannon Mazzante arrived first on the scene, followed shortly by Officer Bernot. A bystander took a video of the incident, which Plaintiff intends on introducing at the time of trial. According to Defendant, when Officer

---

[1] The Court in its Order of January 10, 2020 dismissed the action against the City of Lancaster leaving Officer Philip Bernot as the sole defendant. (ECF No. 77.)

Mazzante arrived, witnesses identified Plaintiff as the source of the disturbance. Defendant Officer Bernot further claims that Officer Mazzante gave Plaintiff commands to sit down, however, he did not comply with those commands. As a result, Defendant avers that Officer Mazzante requested additional officers for a non-compliant individual and, when Officer Bernot appeared, she informed him that Plaintiff would not follow her commands and that Plaintiff had not been patted down for weapons. Defendant Officer Bernot further maintains that he and Officer Mazzante continued to give Plaintiff commands to sit on the curb, but Plaintiff remained non-compliant. The video shows that Officer Bernot deployed his Taser against Mr. Williams. Plaintiff contends that Officer Bernot used excessive force, causing him pain and injury in violation of this rights under the Fourth Amendment of the United States Constitution.[2]

The Court ordered that trial of this matter would commence with jury selection on February 10, 2020. At that time, Plaintiff and Defendant's counsel were present along with the Defendant Officer Philip Bernot. Twenty-five prospective jurors were ready for voir dire. Counsel for Plaintiff informed the Court that Sean Williams was not present and his counsel did not know his present whereabouts. Plaintiff's counsel had arranged for the president of the local NAACP chapter, Mr. Blanding Watson, to see that Mr. Williams board a train at Lancaster for the trip to Philadelphia, however, Mr. Williams did not appear at the station.[3] While Plaintiff's counsel informed the Court that they received no call from Mr. Williams, Defense counsel shared with the Court, via information from their client, that it was their understanding that Mr.

---

[2] The Court developed the facts more fully in its memorandum decision of the Defendants' motion for summary judgment. (ECF No. 76.)

[3] In the hearing transcript on Defendant's Motion to Dismiss, the Lancaster NAACP President is referred to as "Mr. Blandon Watson." (N.T. 5/14/2020, at 48:14-15, 49:14-17.) However, the Pennsylvania NAACP website confirms that his name is "Mr. Blanding Watson." *See* https://pastatenaacp.org/l-m-n/.

2

Williams had an encounter with the police the night before trial and may have been in the hospital. The Court waited for approximately two hours and no further information regarding Mr. Williams surfaced during that time. The Court then adjourned for the day without commencing trial. On February 24, 2020 Defendant Officer Philip Bernot filed a motion to dismiss this case for lack of prosecution. (ECF No. 91.) Plaintiff filed a response in opposition to the motion on March 9, 2020 (ECF No. 93). The Court held a hearing on Defendant's motion on May 14, 2020 via video due to the pending Covid-19 Pandemic.[4]

### Findings of Fact: *Poulis* Analysis

Defendant filed his motion to dismiss pursuant to F.R.C.P. 41(b) which states:

> INVOLUNTARY DISMISSAL; EFFECT. *If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it.* Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits.

Fed. R. Civ. P. 41(b)(emphasis added). The decision to dismiss and action pursuant to F.R.C.P. 41(b) lies within the discretion of the Court. *See Burns v. Glick*, 158 F.R.D. 354, 355 (E.D. Pa. 1994)(citing *Dunbar v. Triangle Lumber & Supply Co.*, 816 F.2d 126, 128 (3d Cir.1987)); *see also Dyotherm Corp. v. Turbo Mach. Co.*, 392 F.2d 146, 148 (3d Cir. 1968).

The Court of Appeals for the Third Circuit has provided guidance regarding the dismissal under F.R.C.P. 41(b) in the case of *Poulis v. State Farm Fire and Casualty Co.* 747 F.2d 863 (3rd Cir. 1984) by listing a number of factors the Court should consider in ruling upon

---

[4] The Court initially set the hearing for March 24, 2020 at the Edward N. Cahn United States Courthouse and Federal Building. Due to health and safety measure taken by the United States District Court for the Eastern District of Pennsylvania, the hearing was continued sua sponte and rescheduled once the Court was able to use its video technology. At the time set for the hearing all participants were at separate locations and consented to the use of video to hold this hearing.

such a motion. The analysis includes: (1) the extent to which the party is personally responsible, (2) the prejudice to the opposing party that results from the delay, (3) any history of dilatoriness, (4) the extent to which the party acts willfully or in bad faith, (5) the possible effectiveness of alternative sanctions, and (6) the meritorious of the claim. No single factor is dispositive and "not all of the *Poulis* factors need to be satisfied in order to dismiss a complaint." *See Ware v. Rodale Press, Inc.*, 322 F.3d 218, 222 (3d Cir. 2003); *Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir. 1992)(citations omitted). The Court will analyze these factors in light of the testimony and argument for and against dismissal of this case.

1. *The extent to which the party is personally responsible.*

"The first *Poulis* factor is an inquiry into the noncompliant party's personal responsibility." *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 319 F.R.D. 480, 485 (E.D. Pa. 2017). The Court must determine "whether the party himself has failed to comply with the court's orders as opposed to whether counsel for the party is responsible." *Brown v. United States*, No. CV 17-1551, 2019 WL 764429, at *4 (E.D. Pa. Feb. 21, 2019)(citing *Briscoe v. Klaus*, 538 F.3d 252, 258-59 (3d Cir. 2008).

In the instant case, Plaintiff had a very effective support system in place to see that he appeared at trial. Plaintiff's attorneys advised him of the time and place of trial and Plaintiff confirmed that he was well aware, for quite a period of time prior to February 10, 2020, that trial was to begin on that date. (N.T. 5/14/2020, at 47:4-10.) On February 9, 2020, the day before the commencement of trial, Plaintiff's attorneys offered to buy him a train ticket to come down that day and stay in a hotel. (N.T. 5/14/2020, at 48:4-8.) Nevertheless, Plaintiff declined this opportunity. *Id.* Instead, Plaintiff's attorneys purchased a ticket for the next morning so that

4

he could arrive at the courthouse in time for the commencement of trial.  (ECF No. 90 at 1.) Notwithstanding this well thought out procedure by counsel and his supporters, Plaintiff failed to appear at trial and failed to contact any of his lawyers.[5] (N.T. 5/14/2020, at 45:5-49:13.)

As noted previously, we learned from defense counsel at the time of jury selection that Mr. Williams had some type of encounter with the police on the evening before trial. During the hearing on Defendant's motion to dismiss, Plaintiff stated that the police saw him walking around and asked him if everything was all right. (N.T. 5/14/2020, at 28:18-21.) Plaintiff told the police that he had "leg pains" and "migraines" so they offered to escort him to the hospital. (N.T. 5/14/2020, at 28:21-23; 29:6-17.)  Plaintiff testified that the encounter did not result in an arrest, but the police apparently took him, at his request, to the Lancaster General Hospital. (N.T. 5/14/2020, at 30:1-12.)  According to police report of the incident, attached to Defendant's motion as Exhibit B, Plaintiff was arrested, issued a citation for "public drunkenness," and held at the police station until he was sober. (ECF No. 91, Ex. B.) Plaintiff was then released at approximately 5:55 AM and transported to the hospital. *Id.*

At Lancaster General Hospital, medical staff asked Plaintiff if he was using (controlled substances) that day and he answered no. (N.T. 5/14/2020, at 31:1-5.)  He testified that he was given a urine test, which proved positive for a controlled substance. *Id.*[6]  He then offered, "And, you know, with the controlled substances, they stay in your body for over, you

---

[5] We note that, according to Plaintiff's testimony at the hearing on the motion to dismiss, at some point when Plaintiff was at the hospital his mother and Mr. Watson were contacted. (N.T. 5/14/2020, at 49:14-19.) Plaintiff testified that they were contacted and knew "that the hospital received [him]." *Id.* While the Court does not know exactly when either his mother or Mr. Watson were contacted, we do know that, by the time Plaintiff was supposed to meet Mr. Watson at the train station, he had not been contacted. Plaintiff's counsel confirmed that "[o]n the morning of February 10, 2020, Plaintiff's counsel learned from the NAACP president that Plaintiff did not arrive for the train." (ECF No. 90 at 1.)

[6] Hospital records from his visit to the hospital later that day confirm that Plaintiff's toxicology screen was positive for PCP. (ECF No. 91, Ex. B, at 000873, 000876.)

5

know, months, weeks". (N.T. 5/14/2020, at 31:3-5) Mr. Williams counsel then asked him about his condition the day before the scheduled trial.  He responded:

> Well, it was -- you know, going before -- you know, having that -- having that court and everything, having to go to court, having to go to court and everything, it was, you know, it was kind of nerve wracking. And it was like, you know, it was a big thing for me. And it was kind of -- it wasn't really scary. It was just, you know, it was the first time that, you know, that that had happened. And, you know, it was just trying to mentally prepare and physically prepare and be prepared. And it was just a bad time at that time. And there was a relapse on my behalf about four weeks prior to the court hearing. And that had nothing to do with the hospitalization or the hospital tried to -- and the police can actually let you know on their behalf that they actually escorted me to the hospital for leg pains and migraines. It had nothing to do with -- nothing to do with drug use. They gave me help.

(N.T. 5/14/2020, at 32:7-22.)  Plaintiff later reiterated that "having court coming up" was "mentally anguishing" and "nerve wracking." (N.T. 5/14/2020, at 40:23-25.)

The parties stipulated at the hearing on Defendant's Motion to Dismiss that the hospital records shall be admitted into evidence. (ECF No. 91, Ex. B).[7]  The first entry upon admission to the hospital states, in pertinent part, as follows:

> Pt to the ED via EMS from LCPD after he was cited and left there.  Pt was sitting on the steps of LCPD. Here in the ED pt does is non-verbal.  EMS reports that he was following commands for them.  Pt has hx of substance abuse. Dr. Reihart at bedside for eval.  VSS, Will continue to monitor.

(ECF No. 91, Ex. B, at 000837.) While this note indicates that Plaintiff was non-verbal at the hospital, most importantly it states, "he was following commands" for the EMS personnel. Hospital staff wrote that Plaintiff appeared to have an "altered sensorium" and noted that he remained non-verbal until a family member arrived in the afternoon. *Id.* at 000838.  The records further note that Plaintiff has a history of substance abuse, specifically with regard to Phencyclidine ("PCP"). *Id.* at 000838-39. Medical staff ultimately concluded that Plaintiff

---

[7] These records actually begin on January 14, 2020 almost one month before trial.

appeared to be "under the influence of synthetic narcotics," however, indicated that he did not need "any other medical or psychiatric attention…." (ECF No. 91, Ex. B, at 000837.)

While he was mostly non-verbal with the hospital staff, the records indicate that he understood commands and, at approximately 1:32 PM on February 10, 2020 when a nurse tried to take his blood sugar, he pulled his hand away stating, "[n]ah I'm not doing that." *Id.* at 000843. Shortly after, Plaintiff pulled off all of his monitors and, as the nurse attempted to replace them, stated, "[n]o I don't want that." *Id.* at 000844. After further discussion with the Plaintiff, he allowed the nurse to replace the monitors. *Id.* at 000845. Finally, by midafternoon, after continually refusing to leave the hospital, Plaintiff was discharged after security was called to escort him out of the building. *Id.* at 000846.

Upon his discharge from the hospital, Plaintiff's mother arrived for him and he testified that she tried to have him involuntarily committed for mental evaluation. (N.T. 5/14/2020, at 34:15-19) Apparently that attempt was unsuccessful.[8] Later that evening, at about 10:30 PM, Plaintiff again arrived at the hospital asking for a mental health evaluation. (ECF No. 91, Ex. B, at 000858.) After the examination, hospital records indicate that the doctor determined Plaintiff did not meet the requirements for a 302 involuntary commitment. *Id.* at 000858. Though Plaintiff told the doctor he was "schizophrenic and has not been taking his medication," the doctor indicated that "patient is not of schizophrenia" and not "suicidal or homicidal." *Id.* at 000860-62.[9] Plaintiff then completed a drug and alcohol assessment and, after

---

[8] The term used at the hearing was that his mother sought to have him "302ed". The Court understands that to be an involuntary commitment pursuant to section 302 of the Pennsylvania Mental Health Procedure Act. 50 Pa. Stat. Ann. § 7302 (West).

[9] During the behavior health exam, Plaintiff mentioned "schizophrenia… well into the assessment and after he denied ever having any mental health treatment in the past." The behavioral health examiner indicated that Plaintiff "does not appear to be an accurate historian, as his story continues to change and evolve at this time." (ECF No. 91, Ex. B, at 000870.)

participating in a phone intake, was accepted into a treatment center and discharged from the hospital.[10] *Id.* at 000874.

While Plaintiff may have a substance abuse problem, there is nothing in the record and nothing in his testimony at the hearing which indicates the taking of any controlled substances on the day before trial was anything but voluntary on his part. Plaintiff claims that he was suffering from a mental and physical emergency, which required him to be at the hospital, yet the records indicate that Plaintiff appeared to be "under the influence of synthetic narcotics." (ECF No. 91, Ex. B, at 000837.) Further, he testified at the dismissal hearing that he was anxious before the trial and was concerned about appearing in court. Though Plaintiff had the opportunity to come down to Philadelphia the evening before jury selection and stay at a hotel, he declined this opportunity and assured his attorneys and the NAACP president that he would arrive at the train the morning of trial. As discussed, Plaintiff did not appear and did not contact his lawyers though he was released from the police station by 5:55 AM.

This Court commends the actions of his lawyers and support system in taking clear measures to get Plaintiff to court. The evidence supports a finding that he knew of this obligation to appear for jury selection on February 10, 2020 and made no efforts to be present or contact his lawyers. Accordingly, we find that the first *Poulis* factor, the extent to which the party is personally responsible, weighs in favor of dismissal.

  2. *The prejudice to the opposing party that results from the delay.*

The Third Circuit has held that "[e]vidence of prejudice to an adversary would bear substantial weight in support of a dismissal or default judgment." *Adams v. Trustees of N.J.*

---

[10] According to hospital records, Plaintiff agreed to come back to the hospital on the 17th for transport to the treatment center. (ECF No. 91, Ex. B, at 000874.)

*Brewery Employees' Pension Trust Fund*, 29 F.3d 863, 873–74 (3d Cir.1994) (internal quotation marks and citations omitted). Prejudice consists of "the irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs imposed on the opposing party." *Id.* at 874.  However, prejudice is not limited only to "irremediable" or "irreparable" harm. *Id.*; *see also Ware v. Rodale Press, Inc.*, 322 F.3d 218, 222 (3d Cir.2003); *Curtis T. Bedwell & Sons, Inc. v. Int'l Fidelity Ins. Co.*, 843 F.2d 683, 693–94 (3d Cir.1988).  It also includes "the burden imposed by impeding a party's ability to prepare effectively a full and complete trial strategy." *Ware*, 322 F.3d at 222.

In support of his motion, Defendant asserts prejudice in having to prepare for trial and arrange for the appearance of an expert in addition to the loss of a week of vacation due to the scheduling of this trial.  At the time the Court learned that Plaintiff was not present and his whereabouts unknown, Defendant's expert was an hour away from boarding his flight.  Fortunately, the expert was contacted by defense counsel before he began his trip to the Court, however, Defendant asserts that the expert still had to expend time to rearrange his travel.

We do note that both parties' counsel have incurred additional expenditures in preparing for this hearing. Should this trial have to be rescheduled, both parties will also have to do additional preparation for trial.  According to the defense counsel, the loss of Defendant's vacation was also not recouped. Where Defendant was prepared to go to trial, and Plaintiff did not show up, the Court has previously explained that Defendant was prejudiced as he "has a legitimate interest in the prompt disposition of allegations against him." *Smith v. Harris*, No. CIV.A. 85-3104, 1986 WL 14170, at *7 (E.D. Pa. Dec. 5, 1986). Accordingly, we find that

9

Defendant has suffered prejudice due to the delay of trial, and this factor weighs in favor of dismissal.

    *3. Any history of dilatoriness.*

    The third *Poulis* factor looks at "extensive or repeated delay or delinquency" which "constitutes a history of dilatoriness." *Adams*, 29 F.3d at 874 (citations omitted). Defendant points to two incidents which he asserts shows Plaintiff to have been dilatory in the history of this case.  First, Plaintiff was ordered to appear at the final pretrial conference along with Defendant and his representatives.  The Court issued this order with the intention of allowing the parties to explore settlement after the conclusion of the pretrial conference matters. Plaintiff was noncommunicative during this effort and therefore his presence in no way advanced settlement discussions.  The second example of dilatory conduct argued by Defendant is that the prior mediation session with the Court had to be rescheduled because counsel for the plaintiff could not locate Mr. Williams. (ECF Nos. 31-36.)

    Both examples are correct.  The Court, however, finds that these incidents did not delay the Court's schedule of dates leading to trial and, while both are examples of Plaintiff's dilatory conduct, neither one materially affected the schedule of this case. "[C]onduct that occurs one or two times is insufficient to demonstrate a 'history of dilatoriness.' " <u>Briscoe</u>, 538 F.3d at 261 (quotations omitted). Therefore, because Plaintiff's conduct did not amount to consistent delay, we find that this factor weighs against dismissal.

    *4. The extent to which the party acts willfully or in bad faith.*

    Under the fourth *Poulis* factor, the Court must consider whether the conduct was "the type of willful or contumacious behavior which was characterized as flagrant bad faith."

10

*Briscoe*, 538 F.3d at 262 (quoting *Adams*, 29 F.3d at 875). Generally, "[w]illfulness involves intentional or self-serving behavior." *Id.* If the conduct is merely negligent or inadvertent, we will not call the conduct "contumacious." *Briscoe*, 538 F.3d at 262.

The Court finds from the facts presented at the hearing that the Plaintiff's failure to appear for jury selection was willful. By his own testimony, Plaintiff asked the police to take him to the hospital on the morning of trial. His testimony demonstrates that this act was knowing and intentional. When Plaintiff arrived at the hospital, he made no attempt to contact his any of the four lawyers representing him in this matter. Plaintiff's testimony reveals that he was extremely anxious the day before trial, and his medical records draw the conclusion that he was under the influence of a controlled substance at the time of his admission to the hospital. The Court draws the inference from these facts that the ingestion of a controlled substance was also a knowing and intentional act. The fact that the medical records indicate, and his counsel affirm, that Plaintiff has had a substance abuse problem[11] does not mean then he did not act intentionally when he took drugs and failed to notify those individuals who had gone to great lengths to see that he appeared at trial. Therefore, the Court finds that Plaintiff's conduct was not "merely negligent or inadvertent," but intentional and, thus, this factor weighs in favor of dismissal.

5. *The possible effectiveness of alternative sanctions.*

The Third Circuit has held that "district courts should be reluctant to deprive a plaintiff of the right to have his claim adjudicated on the merits." *Titus v. Mercedes Benz*, 695 F.2d 746, 749 (3d Cir.1982). Therefore, under the fifth *Poulis* factor, the Court must consider the effectiveness of sanctions other than dismissal. *Id.* at 750.

---

[11] In fact, Plaintiff had just entered a drug rehabilitation facility approximately three days before the hearing on this motion and testified via video from that facility.

11

During the hearing on the motion to dismiss, Plaintiff's counsel suggested that a monetary sanction would be more appropriate should the Court find that the Plaintiff willfully failed to appear at trial. However, his counsel also conceded that his client was indigent. Counsel then suggested that the Court could set a monetary sanction, such as $10,000, to be used to offset any verdict that would be entered in Plaintiff's favor at trial. The Court acknowledges that this proposal has limited effectiveness as a sanction, as Defendant will not be compensated for costs of trial delay should the verdict be in his favor.

In the motion to dismiss as well as during the hearing on the motion, Defendant also recommended sanctions against the Plaintiff in the amount of $10,000 should judgment be entered in his favor at trial. Alternatively, Defendant's counsel suggested that the Court could dismiss the punitive damage claim as an appropriate sanction. If the Court does not impose the sanction of dismissal and allows Plaintiff to proceed to trial, it does not feel that merely dismissing the punitive claim it has already ruled upon would be an appropriate sanction.[12] Further, the Court has not found any precedent to support such a sanction. "The purpose of punitive damages is to punish the defendant for his willful or malicious conduct *and to deter others from similar behavior*." *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306 n. 9 (1986)(emphasis added). Thus, in a case involving alleged excessive force by a police officer, we do not find that dismissing the claim as to punitive damages is an effective alternative sanction.

---

[12] In the summary judgment ruling on the punitive damage claim the Court still retains the right to determine whether this claim will go to the jury at the time of trial.

*6. The meritorious of the claim.*

The final *Poulis* factor looks at the "meritoriousness of the plaintiff's claim or the defendant's defense." *Brown*, 2019 WL 764429, at *8. The standard for determining whether claims are meritorious "is moderate" *Hildebrand v. Allegheny Cty.*, 923 F.3d 128, 137 (3d Cir. 2019)(quoting *Adams*, 29 F.3d at 876). Generally, "in determining whether a plaintiff's claim is meritorious, we use the standard for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Briscoe*, 538 F.3d at 263 (citing *Poulis*, 747 F.2d at 869–70.) Thus, a claim or defense is meritorious "when the allegations of the pleadings, if established at trial, would support recovery by plaintiff or would constitute a complete defense." *Poulis*, 747 F.2d at 869–70.

Plaintiff's claim of excessive force against Officer Phillip Bernot survived summary judgment, and thus, we cannot conclude that this claim is meritless.[13] *See Briscoe*, 538 F.3d at 263 (finding that, where several of the plaintiff's claims survived the summary judgment stage, these claims surpassed the Rule 12(b)(6) motion to dismiss standard and were deemed to have merit); *see also Everett v. Fieldworks*, LLC, No. 2:17-CV-01495-NR, 2019 WL 3955439, at *8 (W.D. Pa. Aug. 22, 2019)(same). We reviewed the facts developed by the parties pretrial and determined that there were sufficient facts to submit the case to a jury to determine whether Officer Bernot used excessive force against Plaintiff and violated his Fourth Amendment rights under color of state law.

The Court finds that the final factor weighs against dismissal. Unlike cases that were dismissed for "vague, rambling allegations of wrongdoing" or contained "relatively scant" allegations, Plaintiff's claim of excessive force is supported by video of the incident. *See Nieves*

---

[13] The Court granted summary judgment in favor of Defendants on the *Monell* claim against the City of Lancaster (ECF Nos. 77-78. ) Accordingly, Officer Phillip Bernot remains the only defendant in this action.

*v. Thorne*, 790 F. App'x 355, 358 (3d Cir. 2019); *Brown*, 2019 WL 764429, at *8. Upon review of the video, a reasonable jury could draw an inference that Plaintiff was complying with orders and did not pose an immediate threat to the officers. Therefore, significant questions exist as to whether the use of force in the form of electric shock from a taser was excessive and in violation of his 4th Amendment rights. As the Court found in its order on Defendant's motion for summary judgment, it continues to find that Plaintiff's claim is meritorious in that a jury should decide whether he should prevail on his claim.

**Discussion: Balancing of the *Poulis* Factors**

In balancing the factors, *Poulis* does not "provide a magic formula whereby the decision to dismiss or not to dismiss a plaintiff's complaint becomes a mechanical calculation." *Mindek*, 964 F.2d at 1373. At the time of the pretrial conference, all preliminary matters had been resolved and Plaintiff only needed to appear at trial and allow his attorneys to proceed on his behalf. Thus, we are presented with the question, "Does his failure to appear constitute grounds to dismiss his case under the terms of F.R.C.P 41(b)?"

As discussed above, three of the factors weigh in favor of dismissal. First, we found that Plaintiff was fully and personally responsible for his failure to appear at trial. The facts clearly show that Plaintiff was in the hospital at the time the Court set for jury selection and commencement of trial. The facts also demonstrate that he was able to communicate during and after the incident that lead to his hospitalization as he told the police he wanted to be taken to the hospital, yet he failed to call his lawyers. While at the hospital, Plaintiff refused to communicate with hospital personnel even though the records show he responded to EMS personnel during his

14

trip to the hospital. During this entire period of time, Plaintiff did not contact his lawyers who only became aware of his location after receiving a phone call from his mother.

Second, though Plaintiff disputes Defendant's contention that it suffered prejudice, the Court finds that in fact the defense did suffer prejudice by his failure to appear at trial. While it was fortunate that the defense expert was contacted before he boarded a plane to travel to Allentown, Pennsylvania for trial, the defense did suffer prejudice. The defense stated that it had to prepare for trial and, through the Court's own experience, we are aware that a lawyer's preparation for trial is both arduous and time consuming. If this trial is rescheduled, that preparation would have to take place once again at the expense of Defendant. In addition, defense counsel also informed the Court that Officer Bernot, who was present at the hearing of this matter, had given up vacation time in order to be present at trial pursuant to the Court's order.

Third, the Court concludes that Plaintiff's failure to appear at the time of trial was willful and in bad faith. He testified at the time of the hearing in this matter that he was aware of his trial date and was in fact anxious about it. Plaintiff made no effort to contact his attorneys who appeared to fulfill this effort to have Plaintiff appear at trial. Plaintiff also made no effort to contact the President of the local NAACP prior to when he was expected to arrive at the train station. The facts certainly show willful conduct which constitutes bad faith on behalf of Plaintiff.

Despite these factors which weigh in favor of dismissal, the Court has also found that Plaintiff has not demonstrated an "extensive or repeated delay or delinquency" which "constitutes a history of dilatoriness." While the Court did set aside time to hold a settlement

15

conference which had to be rescheduled, this event did not delay the trial in this matter. Further, both parties agree that an alternative monetary sanction of $10,000, to offset a favorable verdict to the Plaintiff, could be imposed. While, again, the Court notes that this would not be effective should judgment be entered in favor of the Defendant, it is an alternative sanction that would avoid the harsh penalty of dismissal.

Finally, and most significantly, the Court finds that the sixth factor, the meritoriousness of the Plaintiff's claim, weighs strongly against dismissal. Plaintiff overcame Defendants' motion for summary judgment as it pertained to Officer Bernot, including the denial of dismissal based upon qualified immunity. In other words, this Court found that he had sufficient facts to submit the question of excessive force to a jury. Further, the video of the incident presents strong factual evidence from which the jury could find that the force used by Officer Bernot was excessive in light of the level of resistance or compliance exhibited by Plaintiff and immediate threat to the officer.

After carefully balancing these factors on a whole, the Court finds against dismissal of the matter, but does impose a sanction against Plaintiff by reducing any verdict by $10,000 in order to compensate Defendant for the additional time and rescheduling in this case. While it is clear that this will not compensate the defendant if there is a defense verdict, when balancing the merits of the case and giving Plaintiff the benefit of the doubt, the Court feels this is an adequate sanction.

## Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss this action pursuant to F.R.C.P 41(b) is **DENIED**. Further, the Court imposes a sanction of a set off in the

sum of $10,000 against any judgment entered in favor of Plaintiff. In other words, should a favorable verdict be entered as a judgment in favor of the Plaintiff at trial, the Court will, by this decision, reduce it by the sum of $10,000.  We do not come to this conclusion easily, however, dismissal is a harsh sanction which should be resorted to only in extreme cases. *Dyotherm Corp.*, 392 F.2d at 148–49.

In no way does the Court condone the conduct of Plaintiff and, if there is any future conduct of Plaintiff which interferes or impedes the progress of this case, the Court will use its discretion in dismissing this action with prejudice.